1            UNITED STATES DISTRICT COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3

4  SUSAN M. RUSH,              )

                          )

5           Plaintiff,    )

                          )

6       vs.            )   No. 2:15-cv-01304-

                          )      DSF-MAN

7  CITY OF SANTA MONICA, et al.,  )

                          )

8         Defendants.    )

                          )

9  _____)

10

11

12

13

14

15        DEPOSITION OF LIZETTE LOPEZ, taken on behalf

16  of the Plaintiff, at 1685 Main Street, Third Floor,

17  Santa Monica, California, commencing at 10:42 A.M., on

18  Wednesday, August 19, 2015, pursuant to Subpoena, before

19  BRANDI WILSON, CSR No. 13760, a Certified Shorthand

20  Reporter, in and for the County of Los Angeles, State of

21  California.

22                      ***

23

24

25

```
 1              MS. ROHR:  Objection.  Vague as to "contacting
 2    Susan Rush."
 3    BY MR. AVINA:
 4         Q.   When did you see Susan Rush on
 5    March 29th, 2014?
 6         A.   When did I see Susan Rush?
 7         Q.   Yes.  Did you ever see her anytime throughout
 8    the day?
 9         A.   Yes.
10         Q.   And what time was that?
11         A.   When I was conducting an investigation.
12         Q.   What type of investigation were you
13    conducting?
14         A.   A vandalism investigation.
15              MS. ROHR:  I'm sorry.  I --
16              THE WITNESS:  A vandalism investigation.
17    Sorry.
18              MS. ROHR:  Thank you.  I need to be able to --
19              THE WITNESS:  Yes.
20              MS. ROHR:  -- hear what you're saying.
21              THE WITNESS:  Absolutely.  I'll kind of --
22    I'll --
23    BY MR. AVINA:
24         Q.   Okay.  And so this vandalism investigation
25    involved four minors; is that correct?
```

```
 1         A.   That is correct.

 2         Q.   And do you remember when you initially

 3    detained these four minors -- what time?

 4         A.   Can you ask that question again?  I'm sorry.

 5         Q.   Do you remember what time you initially

 6    detained these four minors?

 7         A.   It was around 6:00 p.m., approximately.

 8         Q.   And --

 9         A.   Can you hear me?

10              MS. ROHR:  If I can just speak.  I don't want

11    you looking at me.  You need to face --

12              THE WITNESS:  Oh.

13              MS. ROHR:  -- face the camera.

14              THE WITNESS:  Right.  I'm sorry.

15              MS. ROHR:  But you need to project your

16    voice --

17              THE WITNESS:  Okay.

18              MS. ROHR:  -- so I can hear you.

19              Also if you're looking towards me, then the

20    most important person in this room --

21              THE WITNESS:  All right.

22              MS. ROHR:  -- the court reporter can't hear

23    you.  Because if she doesn't hear you, it was never

24    said.

25              THE WITNESS:  Sounds good.
```

```
 1   minors to when you first saw Susan Rush?

 2        A.    Approximately five minutes.

 3        Q.    And when you first saw Susan Rush, was

 4   Officer Fujita already present at the location?

 5        A.    Yes, sir.

 6        Q.    Do you know why Officer Fujita arrived at that

 7   location?

 8              THE WITNESS:   I --

 9              MS. ROHR:   Objection.   Calls for speculation.

10              You can respond if you know.

11              THE WITNESS:   He was asked to back.

12   BY MR. AVINA:

13        Q.    What does that mean?

14        A.    There were four juveniles and one officer, so

15   he responded.

16        Q.    Now, did you cite any of these four

17   individuals that you detained?

18        A.    I did not cite them, no.

19        Q.    Did you arrest them for anything whatsoever?

20        A.    I did not arrest them.

21        Q.    Did you ever witness any of these minors

22   commit a misdemeanor in your presence?

23        A.    No, sir.

24        Q.    Why did you detain these four minors?

25        A.    I had reasonable suspicion that a crime may
```

```
 1    have occurred; although, I did not see it.

 2         Q.    You just used the term "reasonable suspicion;"

 3    is that correct?

 4         A.    Yes, sir.

 5         Q.    What is your understanding of what that term

 6    means?

 7         A.    It's a legal standard by which an officer has

 8    the right to briefly detain a person for an

 9    investigation when there are articulable facts that

10    there was, is, or will be a crime.

11         Q.    And so what was the reasonable suspicion that

12    you believed justified the detention of these four

13    minors?

14         A.    I saw broken windows.  Broken glass on the

15    floor.  I saw one of the juveniles peering through the

16    broken glass and that same juvenile reached in and

17    placed his hand through the glass.

18         Q.    Did you see anything from the three other

19    minors that had nothing to do with the broken glass?

20               MS. ROHR:  Could you please read that back?  I

21    think it was a double negative.

22               THE WITNESS:  Yes, I believe so.

23               (The previous question was read back

24               by the court reporter as follows:

25                    "QUESTION:  Did you see anything
```

```
 1          from the three other minors that had

 2          nothing to do with the broken glass?")

 3          MR. AVINA:  Didn't sound like a double

 4   negative to me.

 5          MS. ROHR:  You're asking if she didn't --

 6          MR. AVINA:  That's not what I asked.

 7          MR. ROHR:  Oh, if could you say it again.

 8          (The question was read back by the

 9          court reporter as follows:

10          "QUESTION:  Did you see anything

11          from the three other minors that had

12          nothing to do with the broken glass?")

13          MS. ROHR:  See anything from them that had

14   nothing to do with the broken glass.

15          Overbroad.  Vague and ambiguous.  That would

16   be everything else but the broken glass.

17   BY MR. AVINA:

18     Q.    Do you believe -- was there any reasonable

19   suspicion for the detention of the three other minors?

20     A.    Yes.

21     Q.    What was that?

22     A.    They were all together.

23     Q.    And you were obtaining the FI -- field

24   identification information from all four of these

25   minors -- is that correct? -- on March 29th?
```

1    A.    That is correct.

2    Q.    Why were you obtaining their personal

3    information?

4    A.    Like I --

5          MS. ROHR:   Objection.  Overbroad as to

6    "personal information."

7          You can respond, if you can.

8          THE WITNESS:   Can you ask the question again?

9    BY MR. AVINA:

10   Q.    Why were you obtaining the personal

11   information of these four minors?

12   A.    Like I said before, they may or may not have

13   committed a crime.  So for future reference, if an owner

14   should come forth and say, "Hey, you know, somebody

15   broke my glass," and it happens to be them on video,

16   then detectives can follow up with the information.

17   Q.    So what information is obtained when you

18   obtain a field identification card from a person?

19   A.    Date of birth, address, phone number.

20   Q.    And is obtaining a field identification card

21   something you learn to do or were taught to do?

22   A.    I don't understand the question.

23   Q.    Obtaining the field identification card from

24   an individual, is that something that you were

25   instructed to do, or is that something you did on your

1     Q.   So if they were four white minors, would you

2  have still have detained them and obtained their

3  personal information?

4     A.   Yes.

5     Q.   And, now, at some point on March 29th, you

6  told Officer Fujita that you didn't see them do anything

7  wrong; is that correct?

8     A.   I don't believe that's what I said.

9     Q.   Well, did you make any statement to

10  Officer Fujita regarding, you know, what you were going

11  to do with these four minors that you were detaining?

12     A.   Can you ask the question again?

13     Q.   Did you make any statement to Officer Fujita,

14  March 29th, regarding what you were doing to -- what you

15  were going to do with these four minors in terms of your

16  investigation?

17     A.   I did.

18     Q.   And what was that statement?

19     A.   I was going to fill out the field interview

20  cards and let them go.

21     Q.   And this statement was -- do you remember if

22  it was made before you first saw Ms. Susan Rush or

23  after?

24     A.   I don't recall.

25     Q.   Now, do you remember what -- on

```
 1        A.    No.

 2        Q.    Okay.  Do you remember where your feet were

 3   placed when you first noticed Susan Rush on

 4   March 29, 2014?

 5        A.    I would be guessing.  I believe they were both

 6   on the street.

 7              MS. ROHR:  Just to remind you not to guess.

 8   He's entitled to your best recollection or best

 9   estimate, but --

10              THE WITNESS:  Okay.

11              MS. ROHR:  -- both he and I have cautioned you

12   not to guess because it only confuses the record.

13              THE WITNESS:  Okay.  It's to my best

14   recollection.

15   BY MR. AVINA:

16        Q.    They were both on the street?

17        A.    Yes.

18        Q.    And when you first noticed Ms. Rush, were you

19   communicating with the four minors?

20        A.    I was.  Well, not all four of them but --

21        Q.    And do you know if you were standing while

22   communicating with them, or if you were bending down

23   towards them?

24        A.    I was bent down towards them, yes.

25        Q.    Now, in terms of time, what is your estimate
```

1      A.     (Indicating.)

2      Q.     I mean, if you want to stand you can.  Do you

3  feel you may need to stand?

4      A.     No.  It was about that much that I went back.

5      Q.     Okay.  So were you in fear for your safety

6  when you first noticed Ms. Rush?

7      A.     When I first -- can you ask that question

8  again?

9      Q.     Were you in fear for your safety when you

10  first noticed Ms. Rush?

11      A.     I was fearful of the unknown, absolutely.

12      Q.     How long did this fear of the unknown last, if

13  you remember?

14      A.     I was in fear of her behavior, if anything.

15  And the behavior was erratic, so I didn't know what was

16  going on, who she was, what she wanted, if she was going

17  to harm us.

18      Q.     What did Ms. Rush immediately do after you

19  first noticed her?

20      A.     She sat next to a juvenile.

21      Q.     And the minor that she sat next to, where was

22  he in relation to where you were standing?

23      A.     Can you ask that again?

24      Q.     Where was the minor in relation to where you

25  were standing?

1    **Q.**    And what happened -- and what happened next

2    after Fujita placed her on the ground?

3    **A.**    I assisted him in attempting to put handcuffs

4    on her.

5    **Q.**    And how did you assist?  What's the first

6    thing you did in assisting Officer Fujita?

7    **A.**    I walked over.

8    **Q.**    How far were you when you walked over?

9    **A.**    Approximately, a couple feet.

10   **Q.**    What do you do next after walking over?

11   **A.**    I grabbed ahold of her -- her arm --

12   **Q.**    Which arm did you grab?

13   **A.**    -- and --

14   **Q.**    I'm sorry.  Continue.  Didn't mean to

15   interrupt you.

16   **A.**    I grabbed ahold of her -- her right arm, and I

17   put my left knee -- because she was kicking and -- and

18   still moving around, thrashing about on the ground, I

19   placed my left knee, so I wouldn't be kicked, on the top

20   of her thigh and attempted to gain control of her hand

21   so I can -- and her wrist so I can place handcuffs on

22   her.

23   **Q.**    What -- did you place handcuffs on her?

24   **A.**    I did, yes.

25   **Q.**    Which -- did you handcuff both hands?

```
 1        A.    I -- yes.  With Officer Fujita's assistance.

 2        Q.    Well, do you remember who actually clicked

 3   closed the handcuffs for each hand?

 4        A.    I know I did the right hand.  I don't know if

 5   I did the left as well or if he assisted me.  But I know

 6   I did the right hand.

 7        Q.    Now, what would -- how long would you estimate

 8   that you had your thigh on her?

 9        A.    I didn't have my thigh on her.

10        Q.    What --

11              MS. ROHR:  She had her left knee on the top of

12   her thigh.

13   BY MR. AVINA:

14        Q.    Oh.  How long was your left knee on the top of

15   her thigh?

16        A.    Approximately, maybe a minute, if that.

17        Q.    And I believe you said Officer Fujita had his

18   left knee on her -- on Susan Rush's back; is that

19   correct?

20        A.    I didn't say that.  Well, in my report I did.

21   I didn't say that now.

22        Q.    Okay -- well, so is --

23        A.    I don't know.  Are we talking about what

24   we're -- I said today or --

25        Q.    Well, what did you say today?  You said
```

```
 1   would be guessing if I would say I remembered.

 2        Q.    Who -- do you know who found the cell phone

 3   Ms. Rush had?

 4        A.    Yes.

 5        Q.    Who was that?

 6        A.    That was Officer Fujita.

 7        Q.    And do you know what he did after discovering

 8   the cell phone in her hand?

 9              MS. ROHR:  Objection.  Overbroad.

10              You mean for the rest of the day or with the

11   phone?

12   BY MR. AVINA:

13        Q.    Do you remember what he did immediately after

14   discovering a phone in Ms. Rush's hand?

15        A.    I -- I don't know what he did with it.

16        Q.    Did he ever give it to you?

17        A.    No, he did not give it to me.

18        Q.    Now, while she was being handcuffed, do you

19   remember --

20              MS. ROHR:  Excuse me.

21   BY MR. AVINA:

22        Q.    -- if there was any other officer other than

23   you and Officer Fujita?

24        A.    While she was being handcuffed?

25        Q.    Yes.
```

```
 1        A.    No, there were not.  Do I remember?  No --

 2   yes.  Yes, I do remember, and, no, there were not.

 3        Q.    Do you remember if Officer Fujita ever spun

 4   Ms. Rush around prior to arrest -- prior to putting

 5   handcuffs on her?

 6        A.    Can you ask that question again?

 7        Q.    Do you remember if Officer Fujita ever spun

 8   Ms. Rush in any direction prior to handcuffing her?

 9        A.    He moved her.  I don't know if he spun her.  I

10   don't know.

11        Q.    Well, can you describe the movement that you

12   saw, if any?

13        A.    Like, he moved her from one direction to

14   another.  Like, you know, if, she was facing east, let's

15   say, she was facing north -- south.

16        Q.    Do you remember the direction he spun her --

17        A.    No, I don't.

18        Q.    -- to --

19        A.    I do not recall.

20        Q.    -- or from?

21              MS. ROHR:  Please keep your voice up.

22              THE WITNESS:  Yes.  Sorry.

23              MS. ROHR:  You tend to trail off at the end.

24              THE WITNESS:  I do.  I'm sorry.

25              MR. AVINA:  Deep breath.
```

```
 1   color copy?

 2            Thank you.

 3            MR. AVINA:  We're also putting a "1" behind

 4   Plaintiff's 1.

 5            MS. ROHR:  Okay.  Now, if you ask any other

 6   questions about it, will she have the opportunity,

 7   meaning Officer Lopez, to look at it if she's again

 8   questioned about it?

 9            MR. AVINA:  If she wants to.

10            MS. ROHR:  Okay.  Thank you.

11   BY MR. AVINA:

12       Q.   Officer Lopez, please review these two pages

13   that I have labeled as number "2" on the back.

14       A.   Yes, sir.

15       Q.   Let me know if you recognize what they appear

16   to be.

17       A.   Did you want to me to read it all, or do you

18   what me to tell you what I -- what it is?

19       Q.   Well, if you -- do you know what they are?

20       A.   Yes.  It's my supplemental report, sir.

21       Q.   And is this the report you wrote near or after

22   the incident with Susan Rush?

23       A.   After the incident.  Yes, sir.

24       Q.   And do you remember approximately when you

25   wrote this report?
```

1    statement.  I don't know.  She was -- that was what she

2    kept repeating over and over again.  I did not put every

3    single time she said that in the report.  It's just a

4    summation of what happened, sir.  So she wasn't standing

5    there still, quiet.

6        Q.    So she kept repeating that?

7        A.    She kept saying that, yeah.  Among other

8    things that I don't recall.

9        Q.    Your report then states Officer Fujita --

10   well, your report Officer Fujita once -- strike that.

11            So the sentence in your report where we left

12   off states "Rush did not comply and stood there."

13       A.    Right.

14       Q.    After that, your statement states

15   Officer Fujita placed Rush in a double-wing control

16   hold -- I'm sorry.

17       A.    Yes.

18       Q.    "Officer Fujita placed Rush in a rear

19   double-wing control hold;" is that correct?

20       A.    Yes, sir.

21       Q.    Now, in order to do that, Officer Fujita would

22   need to be behind Ms. Rush; correct?

23       A.    Not necessarily, sir.

24       Q.    So placing someone in that hold could be done

25   while they're facing each other?

STATE OF CALIFORNIA        )
                           )    ss.
COUNTY OF LOS ANGELES      )


          I, BRANDI WILSON, CSR No. 13760, a court

reporter for the County of Los Angeles, State of

California, do hereby certify;

          That prior to being examined, LIZETTE LOPEZ,

the witness named in the foregoing deposition, was by me

duly sworn to testify the truth, the whole truth, and

nothing but the truth;

          That said deposition was taken before me at

the time and place herein set forth, and was taken by me

in shorthand and thereafter transcribed into typewriting

under my direction and supervision, and I hereby certify

that the said deposition is a full, true and correct

transcript of my shorthand notes so taken;

          I further certify that I am neither counsel

for nor related to any party to said action, nor in any

way interested in the outcome thereof.

          IN WITNESS WHEREOF, I hereto subscribe my name

this 31st day of August, 2015.



                         _____
                         Certified Shorthand Reporter in
                         and for the County of Los Angeles,
                         State of California